JULIAN v. AMERICAN NAT. BANK.—106 S. W. (2d), 871.

Middle Section.    March 1, 1937.

Petition for Certiorari denied by Supreme Court, June 17, 1937.

W. L. Bryan, of Atlanta, Ga., Frank M. Young, of Birmingham, Ala., and Manier & Crouch, of Nashville, for receiver.

Bass, Berry & Sims and Fyke Farmer, all of Nashville, for Bank.

FAW, P. J.  Frank N. Julian, receiver of Citizens Life Insurance Company, an Alabama corporation, brought this suit by original bill filed in the chancery court of Davidson county, part 2, on August 22, 1931, against American National Bank, a national banking corporation with its principal office and place of business in Nashville, Davidson county, Tenn.

The legal situs and home office of Citizens Life Insurance Company was in the city of Huntsville, Ala.  Frank N. Julian, a resident and citizen of Birmingham, Ala., was appointed receiver of Citizens Life Insurance Company by decree of the United States District Court for the Northeastern Division of the Northern District of Alabama, on May 27, 1930, and was appointed ancillary receiver of said Citizens Life Insurance Company by the United States District Court for the Middle District of Tennessee, Nashville Division, on June 23, 1930, and this suit was brought by said Julian in his capacity as such receiver and ancillary receiver.

The due appointment of said Julian as such receiver and ancillary

receiver is now admitted by the defendant; but defendant denied below and, through an assignment of error, asserts here that Julian, receiver, etc., was not authorized to bring this suit.

The relief sought by complainant was in part granted and in part denied by the final decree of the chancery court, and both parties appealed to this court from that decree and have assigned errors here.

We have been greatly assisted in the investigation of the large record in this case by the written findings and opinion of the learned chancellor and the oral arguments and elaborate briefs and written arguments by able counsel; but counsel differ so widely in some particulars as to what are the controlling issues in the case that we think it well to preface our consideration of the assignments of error with a statement of the pleadings through which the issues were presented to the chancery court.

Numerous documentary exhibits were filed as exhibits to complainant's bill, to which we need not refer (as exhibits) at this time, as they were subsequently identified by proof or stipulation; but, for purposes of convient reference hereinafter, we will note the numbers of the separate paragraphs in which the several allegations of complainant's bill are made.

In paragraph I (after setting forth the facts with reference to the parties, which we have, in substance, hereinbefore stated), complainant alleges that, ''Ida V. Williams and all the others, who, as plaintiffs, brought the original suits under which your complainant herein was appointed receiver, were policy holders of the Southern Insurance Company whose policies were re-insured by the Citizens Life Insurance Company, and for whose benefit the collateral, hereinafter mentioned, referred to and described in Section III of this bill, had been deposited by the Southern Insurance Company with the Insurance Commissioner of the State of Tennessee and was being held by him as a trust fund for their benefit.''

In paragraph II it is alleged that on or about August 23, 1929, a certain note for $116,099.74, payable to the defendant and purporting to be signed by Citizens Life Insurance Company, was signed in the defendant's banking house in Nashville and delivered to the defendant by Joe F. Little.

In paragraph III it is alleged that, ''At the time of the signing of said note there was deposited therewith, and as collateral security thereto, certain securities aggregating $101,099.57 of which the following is a true and correct list and description: [And then follows an itemized list of twenty-one 'Securities' aggregating the aforesaid sum of $101,099.57.]''

In paragraph IV it is alleged that, ''contemporaneously with the signing of the aforesaid note and the securing of the same by the

aforesaid collateral, a certain check for $116,199.74, payable to the defendant and purporting to be signed by Citizens Life Insurance Company, was delivered to the defendant.''

In paragraph V it is alleged that, ''Prior to the happening of the matters aforesaid, the defendant American National Bank was the holder and owner of the following notes:

''$27,000.00 note of Southern Insurance Company, dated July 26, 1929, due 30 days after date, payable to the American National Bank;

''$24,115.00 note of Southern Insurance Company, dated July 29, 1929, due 30 days after date, payable to the Cumberland Valley Office, American National Bank;

''$15,000.00 note of Southern Insurance Company, dated July 31, 1929, due 30 days after date, payable to the American National Bank;

''$9,000.00 note of Southern Insurance Company, dated July 19, 1929, due 30 days after date, payable to the Cumberland Valley Office, American National Bank;

''$19,200.00 note of Will G. Harris, dated June 24; 1929, due 30 days after date, payable to the American National Bank;

''$10,200.00 note of Russell E. Sharp, dated May 24th, 1929, due 30 days after date, payable to the American National Bank;

''$11,600.00 note of L. T. Little, dated May 24, 1929, due 30 days after date, payable to the American National Bank.''

It is further alleged in paragraph V that said seven notes above listed were paid by the aforesaid check (described in paragraph IV), and were marked ''Paid'' and surrendered by the defendant, the defendant claiming at that time there was due on said notes, principal and interest, the exact sum of $116,099.74.

In paragraph VI it is alleged that, ''for a long time prior to the happening of the matters aforesaid, the Southern Insurance Company, a Tennessee insurance corporation, had been engaged in the insurance business and had been a customer of the American National Bank, and had had many transactions with the Bank and its officials.''

In paragraph VII it is alleged that, ''at the time when Ida V. Williams and the other plaintiffs in the case of 'Ida V. Williams, et al., v. Citizens Life Insurance Company,' in which complainant was appointed receiver, were re-insured by the Citizens Life Insurance Company, the Southern Insurance Company, pursuant to the provisions of chapter 160 of the Acts of the Tennessee Legislature for 1895, had on deposit with A. S. Caldwell, Insurance Commissioner of Tennessee, as security for its policy holders all the aforesaid collateral which is described in Section III hereof; and complainant avers that at said time and at all times thereafter until the date of complainant's appointment as receiver, the Citizens Life Insurance Company was insolvent.''

In paragraph VIII it is alleged that, "On or about July 25, 1929, the Southern Insurance Company executed a certain re-insurance contract with Citizens Life Insurance Company by the terms of which all the then existing insurance business of the Southern Insurance Company and all the then existing assets of the Southern Insurance Company passed out of said Company and were transferred to the Citizens Life Insurance Company except only such assets of the Southern Insurance Company as were then held by the defendant as collateral security to the indebtedness of Southern Insurance Company, which the four notes of the Southern Insurance Company, set out in Section V hereof evidence; and, after the execution of said re-insurance contract, the Southern Insurance Company was wholly without assets except its equity, if any, in the collateral so held by the American National Bank; and upon the execution of said re-insurance contract, the Southern Insurance Company ceased to function as an active business corporation."

In paragraph IX it is alleged that, "Pursuant to said contract of re-insurance, A. S. Caldwell, the Insurance Commissioner of the State of Tennessee, delivered to Joe F. Little all the collateral described in Section III hereof; and, immediately following such delivery, the said Joe F. Little carried the same to the defendant American National Bank and delivered the same to said Bank as collateral to the said note of $116,099.74."

In paragraph X it is alleged that, "the signing and delivery of the $116,099.74 note and of the check for the same amount and the delivery of the aforesaid collateral and the payment of the aforesaid notes of Southern Insurance Company, of Will G. Harris, of Russell E. Sharp and of L. T. Little were all contemporaneous and a part and parcel of the same transaction."

In paragraph XI it is alleged that, "the aforesaid collateral, as described in Section III hereof, was the property of the Citizens Life Insurance Company and a trust fund for the benefit of its policyholders, that the Citizens Life Insurance Company never authorized anyone, and neither Joe F. Little, its President, nor R. E. Smith, its Secretary, were ever authorized, to execute the aforesaid note for $116,099.74 nor to deposit said collateral, mentioned and described in Section III hereof, as security thereto nor to issue the aforesaid check of $116,099.74 nor to pay the aforesaid notes of Southern Insurance Company, Will G. Harris, Russell E. Sharp and L. T. Little, and that said notes of Southern Insurance Company, Will G. Harris, Russell E. Sharp and L. T. Little were not obligations of the Citizens Life Insurance Company and their payment was of no benefit to the Citizens Life Insurance Company and that the Citizens Life Insurance Company never received any of the proceeds of said purported $116,099.74 loan and said loan was of no benefit to it nor was any of the same used to pay its obligations."

In paragraph XII it is alleged that, "all the foregoing facts were known to or ought to have been known to the defendant and that under the facts as herein alleged, the collateral mentioned and described in Section III hereof was the property of the Citizens Life Insurance Company and is now the property of complainant as receiver and ancillary receiver thereof and that complainant is entitled to the possession of the same and said collateral, though demand has been made therefor, has been and still is being unlawfully detained from complainant and none of said collateral is subject to detention by defendant and the detention thereof is wholly unlawful."

In paragraph XIII it is alleged that, "Complainant is informed and believes and, upon such information and belief, avers that many of the securities mentioned and described in Section III hereof have been collected or liquidated by the defendant; and complainant is advised that complainant is entitled to collect the proceeds thereof from the defendant and have a judgment against the defendant for the same and interest thereon where such collateral has been paid or disposed of."

In paragraph XIV it is alleged that, "the taking and detention of the collateral security described in Section III hereof and the collection and detention of the proceeds collected therefrom is, under the circumstances alleged herein, in law a fraud on complainant and those whom complainant represents as Receiver."

After the usual prayer for process and waiver of answer on oath, complainant prayed that the title of complainant to the collateral mentioned and described in section IV of this bill, and complainant's right to the immediate and exclusive possession of same, be decreed and enforced by all necessary orders; that in the event any of said collateral has been liquidated or collected, or otherwise disposed of by the defendant, complainant be given a decree against the defendant for the value thereof, together with proper interest thereon; that complainant have all needful orders for accounting, references, and decrees; and for general relief.

The defendant demurred to complaint's bill, but the demurrer was overruled "with the right in the demurrant to set up and rely in its answer on all defenses contained in its demurrer." No error is assigned in this court upon the ruling of the chancery court on the aforesaid demurrer; hence it is unnecessary to state the contents of the demurrer.

On January 20, 1932, defendant bank filed a "plea and answer to complainant's bill." In its plea the defendant undertook to set up a former suit (or two suits) brought on the ——— day of January, 1930, by one Lewis A. Irons, as ancillary receiver of Citizens Life Insurance Company, against the present defendant and others, in the superior court of Fulton county, Ga., and pending (at the time

the plea was filed), in the Court of Appeals of the state of Georgia, on appeal from said superior court of Fulton county.

But, on motion of complainant, the said plea of defendant was set down for argument as to its sufficiency and was, by the chancellor, overruled and disallowed because "insufficient in law." This ruling of the chancellor upon the defendant's plea is not challenged by assignment of error or otherwise in this court, and need not be further noticed.

Omitting certain allegations and denials of defendant's answer with respect to matters not now in issue, defendant denies that complainant is authorized to bring this suit, and denies that the securities mentioned in the bill were held by the superintendent of insurance of the state of Tennessee, at the time of the transaction with this defendant, of which the complainant complains, as a trust fund for the benefit of any of said plaintiffs in the original suit in the federal court in Alabama.

Defendant states in its answer that, for want of sufficient information, it is unable to answer the allegation in section I of the bill that Ida V. Williams and all the others who as complainants brought the original suit, were policyholders of the Southern Insurance Company; that defendant is advised that said plaintiffs were original policyholders of the superior lodge of the Masons' Annuity, which was a fraternal insurance association organized under the laws of the state of Georgia; that many of the insurance contracts of said fraternal association were reinsured by the Southern Insurance Company some years ago, but that defendant is not advised as to whether any policies were issued by said Southern Insurance Company, or whether the old policies were merely assumed; that all of the Masons' Annuity policies then in force and effect which had been reinsured by the Southern Insurance Company were in turn reinsured by the Citizens Life Insurance Company in the year 1928, pursuant to a reinsurance agreement between Citizens Life Insurance Company and Southern Insurance Company, with the approval of the superintendent of insurance of Tennessee and the commissioner of insurance of Alabama.

"The original suit in the Federal Court in Alabama," just mentioned, had been, by previous allegations in defendant's answer, identified as the suit of Ida V. Williams et al. v. Citizens Life Insurance Company, which was instituted by complainants therein who alleged themselves to be the holders of policies of insurance which had been reinsured by Citizens Life Insurance Company, and in which suit the order appointing complainant, Julian, as receiver of the Citizens Life Insurance Company, had been made upon the application of such complainants.

In its answer defendant admitted the truth of the allegations of paragraph II of complainant's bill, except that defendant stated that

said note for $116,099.74 was not executed and delivered by Joe F. Little alone, as alleged in the bill, but was signed in the name of Citizens Life Insurance Company by its president, Joe F. Little, and its secretary and general counsel, R. E. Smith, and that said note was delivered to defendant by said two officers of Citizens Life Insurance Company for the consideration stated in defendant's answer, and pursuant to authority vested in them by the stockholders and directors of said company.

Defendant also admitted the truth of the allegations of paragraphs III, IV, V, and VI of complainant's bill hereinbefore set forth.

In response to paragraph VII of complainant's bill, defendant said:

"It is admitted that in August 1928 when the policies of the old Masons' Annuity were re-insured by the Citizens Life Insurance Company for the Southern Insurance Company, A. S. Caldwell, as Insurance Commissioner of Tennessee, held a deposit of securities delivered to him by the Southern Insurance Company in compliance with the laws of the State of Tennessee. This defendant, however, does not know whether or not the securities set out in the original bill which were delivered to it in August 1929, were the same securities as were held by the Insurance Commissioner at the time of said re-insurance agreement in August 1928. It is advised that the Southern Insurance Company, as well as other insurance companies having deposits with the Insurance Commissioner, from time to time made substitutions of securities, and it is not advised as to just what securities of Southern Insurance Company were held by the Insurance Commissioner in August 1928. For want of sufficient information this defendant is unable to answer the averment that at the time of said reinsurance agreement, and at all times thereafter until the date of the appointment of complainant, as Receiver, the Citizens Life Insurance Company was insolvent, and therefore calls for strict proof of such allegation, if same be material."

And for answer to paragraph VIII, defendant said:

"This defendant admits that on or about July 25th, 1929, the Southern Insurance Company executed a reinsurance contract with the Citizens Life Insurance Company by the terms of which all of the then existing insurance business of the Southern Insurance Company was taken over and reinsured by the Citizens Life Insurance Company. Said reinsurance contract was the second reinsurance contract between the Southern Insurance Company and the Citizens Life Insurance Company. The first contract was made in August 1928. The policies of the plaintiffs, in the original suit in the Federal Court in Birmingham, or such as were then in force, were reinsured by the Citizens Life Insurance Company under the first reinsurance contract, and not under the second re-

insurance contract. The implication of the original bill that such policies were reinsured under the second contract dated July 25th, 1929, is therefore incorrect. It is denied that by the terms of said reinsurance contract dated July 25, 1929, all the then existing assets of the Southern Insurance Company passed out of said company, and were transferred to the Citizens Life Insurance Company, excepting only such assets of the Southern Insurance Company as were then held by the defendant as collateral security to the indebtedness of the Southern Insurance Company. By the terms of said reinsurance contract, the Southern Insurance Company, obligated itself to transfer to the Citizens Life Insurance Company such an amount of assets in cash or securities as is equal to the required legal reserve on each and every policy contract.''

''Said reinsurance contract does not refer to any specific assets which were to be transferred. It is admitted that after the execution of said second reinsurance contract the Southern Insurance Company ceased to function as an active business corporation. For want of sufficient information this defendant is unable to either admit or deny the allegation that after the execution of said reinsurance contract the Southern Insurance Company was wholly without assets except collateral held by this defendant, and therefore calls for strict proof of such allegation if same be material.''

Defendant admitted the truth of the allegations of paragraphs IX and X of complainant's bill.

Defendant's answer to paragraphs XI, XII, XIII, and XIV of complainant's bill, is as follows:

''XI. It is denied that the securities described in Section 3 of the bill was a trust fund for the benefit of the policy holders of the Citizens Life Insurance Company.

''It is denied that Joe F. Little, President, and R. E. Smith, Secretary of the Citizens Life Insurance Company, were not authorized to execute the aforesaid note for $116,099.74 and to deposit said securities described in Section 3 of the bill with this defendant, and to issue the check for $116,099.74, and to make the agreement whereby said notes of the Southern Insurance Company, Will G. Harris, Russell E. Sharp and L. T. Little, were discharged and surrendered to the said officers of the Citizens Life Insurance Company.

''It is denied that said transaction was of no benefit to Citizens Life Insurance Company. On the other hand, said Joe F. Little, President, and R. E. Smith, Secretary and General Counsel, respectively, of the Citizens Life Insurance Company were fully authorized to have said transaction with this defendant and it was supported by ample consideration as will be hereinafter fully shown.

''XII. It is denied that said securities described in Section 3 of the bill are the property of the Citizens Life Insurance Company,

and are now the property of the complainant as Receiver, and Ancillary Receiver of said Company.

"It is denied that the complainant is entitled to the possession of same. It is true that demand has been made therefor, and that this defendant has refused to give up said collateral until the indebtedness owing to it by the Citizens Life Insurance Company is paid. This defendant is advised that it has the lawful right to hold all of said collateral as security for the indebtedness of the Citizens Life Insurance Company. to it, and that the Citizens Life Insurance Company and the Receiver thereof has only an equitable interest in said collateral, subject to the pledge in favor of this defendant.

"XIII. It is true that some of the securities described in Section 3 of the bill have been collected by this defendant. The total amount collected by this defendant from said collateral at the date of this answer is $——, which has been credited on the indebtedness of the Citizens Life Insurance Company. The amount of said indebtedness remaining unpaid as this defendant believes, is in excess of the value of the remaining collateral uncollected.

"It is denied that the complainant or the Citizens Life Insurance Company is entitled to collect the proceeds of the collateral which has been collected by this defendant, and it is denied that they or either of them have any claim thereto.

"XIV. It is denied that the taking and detention of said collateral and the collection and detention of the proceeds collected therefrom is any fraud upon the complainant or the Citizens Life Insurance Company or any of its stockholders or policy holders or creditors." .

After thus making categorical answer to the several allegations of the bill, defendant denied generally all other allegations of the bill not expressly admitted or denied, and then, in a narrative statement (which covers approximately eleven pages of the transcript), defendant, "for further answer" set forth what it alleged to be "the true facts pertaining to the delivery of the securities described in section three of the bill to this defendant."

Inasmuch as all of the material allegations of the complainant's bill are either specifically denied or admitted by the parts of defendant's answer which we have stated, and the issues between the parties are thus clearly defined, we think it unnecessary to extend this opinion by stating at this point the further allegations of the defendant in the narrative statement above mentioned. The defendant's contentions with respect to the determinative facts will, we think, be sufficiently disclosed in the course of the statement herein of the findings and opinion of the chancellor and of this court.

The aforementioned "plea and answer" of the defendant was filed on January 20, 1932. And thereafter a large volume of proof was taken and filed, concluding with a stipulation with respect to certain

facts, which stipulation was filed on May 27, 1935. On May 31, 1935, the complainant, by leave of the court, amended his bill as follows:

"(1) By adding to Section VII the following paragraph: The contract of reinsurance, under which the said Ida V. Williams and the other plaintiffs in the case of 'Ida V. Williams et al. v. Citizens Life Insurance Company' were reinsured by the Citizens Life Insurance Company, was a certain contract of August 15, 1928, between the Southern Insurance Company and the Citizens Life Insurance Company and preceded the reinsurance contract set out in Section VIII hereof; but complainant avers that both reinsurance contracts were part of a single fraudulent scheme whereby it was sought to defraud the Citizens Life Insurance Company and the policy holders of the Southern who were reinsured by the Citizens Life Insurance Company.

"(2) By adding at the end of Section XIV the words 'as well as a fraud in fact' and by adding to said section the following paragraph:

"Complainant avers that the transactions herein alleged were all part of a fraudulent scheme, whereby the defendant American National Bank sought to secure payment of notes of questionable origin, which were worthless or of doubtful value, and these transactions were the culmination of a series of fraudulent transactions in which the defendant American National Bank and its officials had participated; and complainant further avers that in the furtherance of this fraudulent scheme, the defendant American National Bank and its officials colluded with the makers of the notes and with Joe F. Little, the President of the Citizens Life Insurance Company.

"(3). By adding to the allegations of the bill, and before the prayer thereof, an additional section (XV), as follows:

"XV. Under the law of Alabama, the charter of an Alabama Corporation, together with the General laws of Alabama, is the measure of its powers and an Alabama corporation has no powers except those expressly stated in its charter or conferred by the general law of Alabama; and the exercise of any power not expressly stated in the charter of an Alabama life insurance corporation or conferred by the general laws of Alabama, is ultra vires the corporation; and an Alabama life insurance corporation has no power to pay or contract to pay the obligation of another or to endorse or become liable for the debt of another as an accommodation endorser and the same is ultra vires an Alabama life insurance corporation and void.

"Under the law of Alabama, an Alabama corporation cannot ratify a contract or act which is ultra vires the corporation; nor can it be estopped in seeking to rescind or avoid the ultra vires contract or act."

Subsequently the case was heard by the chancellor upon the entire record and a decree was entered as follows:

"This cause came on to be heard before Chancellor James B. Newman on this January 3rd, 1936, and former days of the term upon the entire record, oral argument and briefs of solicitors, from all of which and for the reasons indicated in a memorandum opinion authenticated by the signature of the Chancellor, ordered filed and made a part of the record;

"It is ordered, adjudged and decreed by the Court:

"(a) That Joe F. Little, President, and R. E. Smith, Secretary, of the Citizens Life Insurance Company, in paying the individual notes of Will G. Harris, Russell E. Sharp, Lloyd T. Little to the defendant bank and pledging the assets of the Citizens Life Insurance Company for money borrowed in its name for that purpose, was unauthorized and did not bind the Citizens Life Insurance Company, but that these officials did have authority to borrow and pledge as collaterals, the assets of the Citizens Life Insurance Company on that part of the note for $116,099.72 which represented and was used in the liquidation of the indebtedness of the Southern Insurance Company to the bank evidenced by the four notes of that company held by the bank which the Citizens, in law, were obligated to pay and discharge; and that the defendant bank has the right to hold the collateral deposited by these officials as collateral on this part of note and on the $30,000.00 note owing to it by the Citizens Life Insurance Company. The defendant will pay the costs of this cause.

"(b) It not sufficiently appearing what amounts have been credited on these notes from collections on the collateral deposited and what collaterals remain in the hands of the bank, this case is referred to the Clerk and Master who will from the proof on file and such proof as may be taken and filed within a time to be fixed by him, report at an early rule day on the following matters:

"1. What collaterals and the amounts thereof were deposited with the defendant bank by Little, President, and Smith, Secretary of the Citizens Life Insurance Company, on August 23, 1929.

"2. What amount has been collected on this collateral and what part of said collaterals now remain in the hands of the bank;

"3. What collaterals in the hands of the defendant bank held on the notes of the Southern Insurance Company that were paid by the Citizens Life Insurance Company were retained as collateral on the $116,099.72 note, and how much has been collected thereon and applied to this note;

"4. What balance, if any, is now due on the $116,099.72 note;

"5. What balance, if any, is now due on the $30,000.00 note;

"To so much and such parts of the foregoing decree as denies to the complainant a recovery of all of the collaterals sued for or their

value, and to all the foregoing decree, except such part or parts thereof as allow complainant a recovery or are favorable to complainant, the complainant excepts and prays an appeal to the Court of Appeals sitting at Nashville, which is granted upon his executing bond as required by law, and he is allowed thirty days from the entry of this decree in which to perfect his appeal.

"To so much and such parts of the above decree as awards a recovery of the collaterals or their value held by defendant bank on that part of the indebtedness of Will G. Harris, Russell E. Sharp and Lloyd T. Little to defendant Bank, and taxes it with the costs, the defendant excepts and prays an appeal to the Court of Appeals sitting at Nashville which is granted upon its executing bond as required by law, and it is allowed thirty days from the entry of this decree in which to perfect its appeal.

"By consent all the exhibits in the case will be attached to the transcript and sent up in their original form by the Clerk and Master."

The complainant and defendant perfected their respective appeals, and each has assigned errors in this court.

It is seen from recitals in the foregoing decree that it was based upon "the reasons indicated in a memorandum opinion authenticated by the signature of the Chancellor, ordered filed and made a part of the record."

The opinion of the learned chancellor, thus made a part of the record, contains a clear statement of the determinative issues, the chancellor's findings of the material facts, and his conclusions of law thereon; and, as the assignments of error are, in large part, directed to the "holdings" of the chancellor (with respect to matters of fact and questions of law, and mixed questions of law and fact) stated in his said written opinion, we think it will contribute materially to an understanding of the propositions upon which the assignments of error are predicated, and will facilitate our disposition thereof, to quote the chancellor's opinion in full, which is as follows:

"The bill in this case was filed by Frank N. Julian in his capacity as receiver and ancillary receiver of the Citizens Life Insurance Company, against the American National Bank. The bill as amended seeks to recover certain securities set out and described in the bill of the face value of $101,109.57, or in the alternative the value thereof. The bill seeks a recovery upon the grounds—

"(a) That the Citizens Life Insurance Company never authorized Little, its President, and Smith, its Secretary, to execute the note for $116,099.72 and attach thereto the aforesaid collateral, nor to issue the check for $116,099.72 and pay the notes of the Southern Insurance Company and others to the American National Bank, as these were not obligations of the Citizens Life Insurance Company, and

their payment was of no benefit to it, nor did it receive any of the proceeds of the loan of $116,099.72.

"(b) That the execution of the note, the depositing of the collateral thereto and the payment of the debts of the Southern Insurance Company and others to the American National Bank from the proceeds of the loan made to the Citizens Life Insurance Company, was a fraud in law and in fact on those whom complainant represents as receiver, and that both reinsurance contracts were part of a fraudulent scheme.

"The defendant answered the original bill and denied the material allegations thereof, and challenged the right of the complainant to recover on any of the grounds alleged in the bill. There appears to have been no answer filed to the amendment to the bill, though paragraph fourteen of the answer to the original bill denies any fraud on the part of the defendant.

"The authority of the receiver to bring this suit appears from the orders made by the Federal Court in Birmingham which appointed him, and in the ancillary . . . proceedings had in the Federal Court at Nashville. He had specific authority to institute the suit.

"On the facts revealed in this record the defense of laches is not available to defendant bank. See State v. McPhail, 156 Tenn., 459, 460, 2 S. W. (2d), 413; Samuel v. King, 158 Tenn., 546, 14 S. W. (2d), 963.

"The Southern Insurance Company was a Tennessee corporation organized in 1906, and it did business in Tennessee and several other states. During its active life it reinsured the policyholders of several insurance companies. It had large financial dealings with the American National Bank, all of which had been paid and discharged prior to the time its indebtedness to the bank involved in this cause, arose.

"The Citizens Life Insurance Company was an Alabama corporation and was organized in June, 1928, and on August 22, 1929, before the assets on deposit with the insurance commissioner of Tennessee, belonging to the Southern Insurance Company, were delivered to it by him, it qualified to do business in Tennessee.

"The Southern Insurance Company and the Citizens Life Insurance Company entered into two reinsurance agreements. The first agreement was made August 15, 1928, and the second July 25, 1929. The first of these agreements reinsured the entire ordinary life business of the Southern and the second reinsured all of the remaining business of the Southern.

"The first insurance agreement provided for a schedule of the cash and assets of the Southern Insurance Company that were transferred as reserves on the policies reinsured by the Citizens Life Insurance Company. This schedule was not attached to the reinsurance agreement when it was approved by the commissioners of Alabama

and Tennessee. However, on the same day, August 15, 1928, a supplemental agreement was made between these two companies setting out these assets. It likewise appears that no schedule of cash and assets was attached to the second insurance agreement. This agreement was approved by the Commissioners of Alabama and Tennessee.

"On January 15, 1929, the stockholders of the Citizens adopted the following resolution:

" 'Whereas, it is for the best interest of said Corporation that the authority to sell, convey, mortgage, pledge, assign or otherwise dispose of said real estate and said real estate mortgages on real estate, should be vested in some officer or officers of the Company with full authority to act so that special meetings of Stockholders will not be necessary to be held to authorize the sale, conveyance, pledge, mortgage or other disposition of said real estate and real estate mortgages.

" 'Now, Therefore, be it Resolved by the Stockholders of the Citizens Life Insurance Company, a Corporation, as follows: that the President of said Corporation, together with the Secretary or Treasurer, thereof, be and the same are hereby fully authorized and empowered on behalf of and in the name of the Citizens Life Insurance Company, a Corporation, to sell, convey, mortgage, pledge, assign or otherwise dispose of, from time to time, any or all of the real estate and real estate mortgages upon real estate now held and owned by said Corporation or hereafter acquired, to such person, firm or Corporation, and upon such terms and conditions and for such considerations as they may agree upon. And they are authorized to accept the consideration agreed upon, wholly in cash or partly in cash and partly upon deferred payments safely secured. And,

" 'Be It Further Resolved that upon making such sale, conveyance, mortgage, pledge, transfer or other disposition of said property, they are authorized and empowered for and on behalf of and in the name of said Corporation to execute and deliver to the purchaser, Mortgagee, Pledgee, or Assignee, of such property, a good and sufficient deed of conveyance, mortgage, pledge or assignment and where necessary to attach the seal of said Corporation to such instrument.'

"Thereafter negotiations took place whereby the Citizens Life Insurance Company executed the note for $116,099.72 and applied the proceeds thereof to the payment of certain debts to the American National Bank. The negotiations were conducted on behalf of the insurance company by its president, Joe F. Little, and its secretary and general counsel, R. E. Smith, and the note was signed by the Citizens Life Insurance Company, by Little, its President, and Smith, Secretary. Houston and Armistead represented the bank in this matter. After this note was executed its proceeds were passed to the credit of the Citizens Life Insurance Company, and on that day the Citizens Life by Little, its President, issued a check to the bank for the exact amount of the loan.

"The check given to the bank from the proceeds of this loan, was signed Citizens Life Insurance Company, by Little, President. It was not countersigned by any other officer, though Smith the secretary and general counsel was present when this check was signed by Little as president, and knew of the disposition of its proceeds. The bank applied the proceeds of this check to the payment of four notes held by it aggregating approximately $75,000.00. These notes were all signed by the Southern Insurance Company and were payable to the American National Bank and had certain collateral attached to them, part of which was surrendered to Little and Smith, and the balance retained by the bank as collateral on the new note for $116,-099.72 executed by the Citizens Life Insurance Company. The collateral attached to the note that was turned over to Smith and Little were second lien notes on property in Atlanta, Georgia, signed by Will G. Harris, and secured by a mortgage referred to in the record as 'the million dollar mortgage,' and 10,000 shares of the stock of the Southern Insurance Company. This stock had been cancelled on the books of the Southern before it was delivered by the bank to Little and Smith, and the proof reveals that this so-called 'million dollar mortgage' securing the vendor's lien notes of Harris on the Atlanta property, was worthless because the first mortgage which had been given by the Southern to the Interstate Life & Accident Company has been foreclosed and those notes are now without any value whatever. It shows also that there was some litigation about the first mortgage given by the Southern Insurance Company to the Interstate Life & Accident Company on this property by the receiver of the Citizens Life Insurance Company, and that the suit was compromised by the payment of $15,000.00. This compromise in nowise involved the Harris second lien notes secured by the million dollar mortgage, as all reference to that transaction and instrument was stricken from the pleadings in the suit in the Federal Court in Atlanta, Georgia, before the $15,000.00 compromise was entered into by the parties.

"The other notes to which the proceeds of this check for $116,099.72 were applied by the defendant, American National Bank, was a note of Will G. Harris for $19,200.00 secured by certain collateral, among which was a mortgage on his home for $22,500.00, and 4300 shares of stock of the Southern; a note of $10,200.00 signed by Russell E. Sharp who was president of the Southern, and endorsed by Will G. Harris, to which was attached 1500 shares of stock of the Southern as collateral; and a note for $11,500.00 signed by L. T. Little to which was attached as collateral 1500 shares of the stock of the Southern. These three notes aggregated $41,000.00, and were all payable to the American National Bank and were all an obligation either directly or by endorsement of Will G. Harris. The mortgage on the

154

home of Will G. Harris for the sum of $22,500.00 was cancelled and released by the bank, but the mortgage was not turned over to the Citizens Life Insurance Company. The only collateral it turned over to the Citizens Life Insurance Company was the stock of the Southern Insurance Company of approximately 17,300 shares which was at the time without value, as all the assets of the Southern had been transferred to the Citizens and the Southern was a mere shell.

"Will G. Harris, whose note was paid to the American National Bank by the Citizens Life Insurance Company, had been a former president of the Southern Insurance Company, and very active in its affairs, and Russell E. Sharp whose note was also paid, was president of the Southern Insurance Company, Joe F. Little was the president of the Citizens Life Insurance Company, and his son, Lloyd T. Little, whose note was paid at the bank by the Citizens, was Vice-President of the Southern.

"The $116,099.72 note was renewed eight times by the Citizens Life Insurance Company before it passed into the hands of the receiver. The last two of these renewals were made by Caldwell, President, and Hutchens, temporary secretary, and were made after Pierce, Murphy and Caldwell, all officials of the Citizens, had talked to officials of the American National Bank about this note and collaterals attached thereto, and after Higgins, who audited the books of the Citizens in 1929, was furnished with all the information about this loan and the application of its proceeds.

"The defendant Bank made a report to the Citizens Life Insurance Company about the collections on the collaterals, and when these notes were renewed, the Citizens Life Insurance Company paid the interest with its checks.

"In October 1929, the Board of Directors of the Citizens Life Insurance Company organized a finance committee, and this finance committee had and performed from that time largely all the duties of the Board of Directors. Caldwell had succeeded Little as President in 1930, and Smith, who is now dead, ceased to be the secretary of the Citizens in 1930. A short time before August 23, 1929, the defendant bank had loaned $30,000.00 to certain gentlemen in Huntsville connected with the Citizens Life Insurance Company and the proceeds were passed to the credit of the Citizens Life Insurance Company and were checked out by that company. It appears from the record when this note was first renewed it was signed by the Citizens Life Insurance Company, and also by the original makers of the note. There has been paid on this note about $8,500.00, and there is a balance due of approximately $21,500.00, and a balance due of approximately $33,600.00 on the $116,099.72 note. By a resolution of the finance committee the collaterals held by the bank on the $116,099.72 note were to be held by it, also on the $30,000.00 note.

"The $75,000.00 indebtedness to the bank evidenced by notes signed by the Southern, and paid with part of proceeds of $116,099.72 note, originated after the previous dealings complained of in the record between the bank and the Southern had been settled and closed. The loans made by the bank involved in this $75,000.00 indebtedness, were all made from and after the Spring of 1928, and have no connection with any of the other transactions complained of, and the Southern received and used the proceeds of all of these notes.

"In January, 1925, it is claimed that Will G. Harris, a former president of the Southern Insurance Company, received a check from the Southern for $200,000.00 and misplaced the proceeds, and that certain officials of the bank were the beneficiaries of part of the proceeds of this check; and that these officials of the bank borrowed money from the Southern Insurance Company and made a loan to the Southeastern Trust Company, and that these transactions were fraudulent and a diversion of the funds of the Southern Insurance Company. It appears from the record that the bank did not receive any benefit from any of these transactions, and that the officials of the bank were acting in their individual capacities, and were engaged in an independent act on their own account with which the bank had no connection whatsoever and which had no connection with the matters involved in this suit.

"The Citizens Life Insurance Company in this litigation derives its rights from the reinsurance agreements entered into between the Southern and the Citizens. It was by and under these agreements that the Citizens acquired the collateral sued for, and the former policy holders of the Southern Insurance Company reinsured by the Citizens, derive their rights to these assets from these agreements, and by their action in putting the Citizens in the hands of a receiver and seeking to reach its assets, they have ratified and approved these reinsurance agreements.

"The action of the stockholders in giving its president and secretary the power to pledge, assign and otherwise dispose of its real estate mortgages, gave them authority to pledge the collateral in the bank which consisted of bonds and notes secured by mortgages and vendors lien notes. The making of the note for $116,099.72 and the payment of the indebtedness at the American National Bank were all a contemporaneous agreement and transaction. It was in effect a substitution of the name of the Citizens Life Insurance Company for that of the Southern Insurance Company, and Harris, Sharp and Little, on the notes held by the bank against these parties and in effect the same as if they had pledged these collaterals for the payment of these debts. Little and Smith as officers of the Citizens had authority to pledge this collateral on any debt of the Citizens, moreover, they had authority to borrow

money and put up the mortgages as collateral and apply the proceeds to the debt of the Southern, for which the Citizens Life Insurance Company was liable, since certainly the power to do the greater thing, namely, sell the collateral to pay debts, would carry the power to do the lesser thing, pledge the collateral to raise money to pay debts of the Citizens Life Insurance Company. There is no action of the stockholders or Board of Directors of the Citizens appearing in the record that conferred any authority on Little the president, and Smith the secretary and general counsel, to pay the private debts of Will G. Harris, Sharp and Little, and these officials of the Citizens Life Insurance Company had no such implied power.

"The liabilities of the Southern assumed by the Citizens on the reinsurance contracts heretofore mentioned were approximately $770,-000.00 under the second contract, and under the first approximately $800,000.00 and the securities which the Southern turned over to the Citizens were approximately of the value of $101,099.57 and these securities were turned over by the insurance commissioner to Little, president of the Citizens, upon the advice of the Attorney General of Tennessee, after the Southern had ceased to do business in Tennessee and the Citizens qualified to do business in Tennessee.

"After the second insurance agreement was entered into between the Southern and the Citizens, the books and papers of the Southern were sent to the Citizens in Huntsville, and it became entitled to all of the cancelled checks of the Southern and it appears that the cancelled checks in the matters involved were in the possession of the Citizens Life Insurance Company. As stated, the stock of the Southern held as collateral by the bank was 10,000 shares on its notes against the Southern; 4300 shares on the $19,200.00 note of Harris; and 1,500 shares on each of the notes of Little and Sharp. What value this stock could have been to the Citizens, it is difficult to understand, since under an agreement between the Citizens and the Southern, any stockholder of the Southern might exchange his stock for stock in the Citizens. This would not authorize the Citizens to acquire the stock of the Southern and have its own stock reissued to it. This stock at the time it was delivered, as stated, was valueless, because the Southern was a mere shell, and it does not appear that the Citizens got any benefit whatever from cancelling the mortgage on Will G. Harris home held by the bank as collateral to his note. All that the Citizens got out of the payment of the $19,200.00 note was 4,300 shares of worthless stock from the Southern and the bank got the benefit of the Harris note, and Harris got the benefit of having his mortgage on his home cancelled. The note for $30,000.00 was dated July 29, 1929, and was discounted by the Bank August 9, 1929 prior to the transaction involved on August 23, 1929.

"It appears that the receivership proceedings against the Citizens

was instituted in May 1930, in the Federal Court at Birmingham. This was some nine months after the transactions involved occurred. Caldwell, who renewed these notes twice, was elected president in 1930 and had previously been a director and medical examiner of the company, and the record shows he was frequently around the office of the Citizens while the audit of the Citizens was going on which commenced in October 1929, and as heretofore stated, he had talked to the officers of the American National Bank and had been furnished with collaterals that had been liquidated that were attached to the $116,099.72 note. It is a very reasonable inference that he and Hutchens, the temporary secretary, had all the information that the bank imparted to Higgins, the examiner, when these notes were renewed.

"The complainants in the bill under which this receivership was had, were former policy holders and beneficiaries under the Southern Insurance Company, reinsured in the Citizens and said policyholders continued to pay their premiums to the Citizens and the beneficiaries to receive payments from the Citizens after the insurance agreements were made, and are claiming their rights in this suit under and by virtue of these agreements. If these re-insurance contracts are void for fraud or any other reason the receiver has no right to maintain this suit and recover assets belonging to the Southern. In that event the assets would belong to the Southern and not the Citizens. The Citizens Life Insurance Company has the right to complain of the action of the bank and of its president and secretary in the negotiations of the $116,099.72 note and the application of its proceeds to the indebtedness of the Southern and certain individuals to the bank, and to recover these assets or their value if they have been liquidated, if this transaction was unlawful and unauthorized, but this position assumes the validity of the reinsurance agreements, because that is the basis of the acquisition by the Citizens of the assets involved. Of course it is well settled that ratification by an officer having power to disaffirm, must be made with full knowledge of all the material facts, and such an officer must possess power or authority to have acted in the first instance in order to bind the corporation, but here you have a resolution which authorized Smith and Little as president and secretary, to pledge, assign and otherwise dispose of these collaterals for the debt of the corporation, and since the Southern conveyed all of its assets to the Citizens and became a mere shell and quit business, the Citizens thereby in law became obligated for the valid debts of the Southern and these two officials of the Citizens had a right to pledge these securities for the debt of the Southern to the bank. Jennings & Co. v. Ice Co., 128 Tenn., 231, 159 S. W., 1088, 47 L. R. A. (N. S.), 1058. But this did not give them the right to borrow money to pay the Harris, Sharp and Little notes to the bank, or

pledge or assign collateral on these debts. Nor is there any ratification of this act from the fact that Caldwell and other officers of the company renewed this note, part of the proceeds for which were used for paying this $41,000.00 of the private debts of said individuals to the bank. They as officers of the company had no authority to pay that part of the indebtedness in the first instance, and therefore are without power to ratify it.

"In Tennessee, a complainant need not aver a return or offer to return the consideration of a contract sought to be vacated for fraud, because as a condition to the relief sought, a court of equity will decree a restoration of such consideration as a condition of granting the relief prayed. Where the property is of no value and the record shows it is of no value, a return or offer to return, is not necessary as a condition to granting relief because it would be a useless form. Hawkins v. Byrn, 150 Tenn., 1, 12, 13, 261 S. W., 980.

"Section 6112 of the Code in substance requires that all domestic insurance companies doing business in this state for the protection of policyholders, shall keep at all times the sum of $100,000.00 invested in bonds, securities or mortgages to be certified as safe and worth said amount by the insurance commissioner.

"By section 6128 it is provided among other things in substance, that the State Treasurer, now the Insurance commissioner, shall take and hold in trust deposits made by a domestic insurance company to enable it to do business in other states and that he may return the whole of such securities when he shall be satisfied that they are subject to no liability and are not required to be longer held by any provision of law or for purposes of the original deposit. As heretofore stated, the commissioner asked the advice of the Attorney General and was advised that he might return these collaterals to the Citizens upon the Southern ceasing to do business and the Citizens qualifying to do business in Tennessee, and in pursuance of these sections of the Code and such advice he returned these collaterals to Little the president of the Citizens. At the time this occurred, and for more than nine months after it occurred, no policyholder of the Southern complained, but the policyholders, who are here complaining, reinsured in the Citizens and looked to the assets of the Citizens for the protection of their policies, and they are not now in position to claim that this was a trust fund for their benefit. When they failed to take action, and the Citizens took these securities over, they became part of the general assets of the Citizens Life Insurance Company unaffected by any trust for their benefit. An insurance company, as long as it is a going concern, may deal with its property and transfer it for value to its creditors though insolvent and unable to pay all of its creditors; such a company may continue its operation, pay off its debts, although part of the creditors be thereby deprived of their security.

"The trust fund doctrine attaches only when there is a positive act of insolvency, such as filing a bill to administer assets of a corporation, making a general assignment, or a permanent cessation to do business. The fact that a corporation is in debt and insolvent, does not prevent it from selling its property where there is no lien, trust or fraud involved in the sale. A corporation is not insolvent in the sense that its assets become a fixed trust fund for pro rata distribution among its creditors, so long as it continues a going concern.

"The Citizens continued for more than nine months after this transaction, to do business in this and other states, conducting its business in an ordinary way, and although its debts may have greatly exceeded its assets, the assets were not a trust fund, and it could dispose of them during that period of time. Tradesman Pub. Co. v. Car Wheel Co., 95 Tenn., 634, 32 S. W., 1097, 31 L. R. A., 593, 49 Am. St. Rep., 943; McClaren v. Roller Mill Co., 95 Tenn., 696, 35 S. W., 88; Mechanics' Bank & Trust Co. v. Knoxville Ry. Co., 148 Tenn., 113, 251 S. W., 906; McKeldin v. Gouldy, 91 Tenn. (7 Pickle), 677, 20 S. W., 231; Gibson's Suits in Chy, sec. 806, paragraph 2; Hicks v. Whiting, 149 Tenn., 411, 413, 258 S. W., 784 (Syl. 9).

"The policy holders of the Southern accepted reinsurance in the Citizens. They did not have to do this, but having elected to do it, they can look only to the reserves of the Citizens for the protection of their policy rights. They could have treated this transfer as an abandonment of their contract rights and brought an action at once for an accounting and recovering of the amount due on their policies; or they could have continued to pay the premiums under protest and thereby kept their contracts alive against the Southern and the assets transferred by it. Or they could have acquiesced in the transfer and the assumption of their claims and accepted the new insurers, which latter course they pursued in this case. There is no doctrine of law or equity that a man may ratify and repudiate the same transaction, and these policy holders having elected to reinsure in the Citizens and pay their premiums to it, ratified these insurance agreements. Watson v. National Life & Trust Co. (C. C. A.), 189 F. 872.

"The case of West, Receiver of the Southern Insurance Company v. Will G. Harris et al., decided by the Supreme Court at the December term, 1934, was a suit by the receiver to recover from certain directors of that corporation losses alleged to have been sustained by the company in consequence of their negligence and maladministration.

"The Court held that the suit was barred by the six years statute of limitation, and since there were no creditors of the Southern when the alleged diversion of assets occurred except policy holders, there could be no recovery, and as to policy holders the Court said:

"'As to the policyholders, there is filed with the stipulation, a

contract which we understand was executed, by the terms of which the Citizens Life Insurance Company of Alabama assumed all the obligations of the Southern Insurance Company upon policies issued by the latter company. We do not understand therefore that any policy holders of the Southern Insurance Company are here complaining, or that the receiver has any authority to act for them.'

"Memorandum Opinion of Supreme Court, December Term, 1934, at Nashville.

"How can a former policy holder of the Southern who has accepted reinsurance in the Citizens, now complain of the action of the Southern in making the reinsurance contracts, as their suits here and in the Federal Court, assume the validity of the reinsurance contracts and their acceptance of the new insurer.

"A large volume of evidence was taken in this case and many objections to evidence were made. The gravamen of the bill is fraud, and a wide latitude of evidence is allowed, as fraud is seldom established by direct evidence, and frequently it becomes necessary to show many circumstances apparently remote and disconnected, to establish it.

"The Court has overruled many of the objections to this evidence, upon the theory that the whole case should be before the Court so it could determine from a consideration of all the facts, whether a case of fraud was made out by a preponderance of the proof. But upon consideration of all of the proof the Court has reached the conclusion that the various transactions alleged to have taken place between the officers of the Southern and certain officials of the defendant bank, were acts of these officers as individuals, and not as officers of the bank; that the bank had no interest in these transactions, received no profit therefrom and the transactions are not connected with the matter involved, and the knowledge of these officers is not imputable to the bank since it would have been against their interest to have disclosed it to the bank. Freeman v. Citizens' National Bank, 167 Tenn., 399, 404, 70 S. W. (2d), 25; People's Bank of Springfield v. True, 144 Tenn., 171, 231 S. W., 541. In such a case the general rule that notice to an agent while acting in the scope of his authority, is notice to the principal, has no application.

"The Court is of opinion that the defendant bank is entitled to hold the collaterals involved until that part of the $116,099.72 note which represents the indebtedness of the Southern Insurance Company to it, of approximately $75,000.00 and the $30,000.00 note of the Citizens Bank to it, have been discharged. The Citizens Life Insurance Company received the benefit of the $30,000.00 note and made repeated payments on it, and in law was obligated to pay the $75,000.00 of indebtedness of the Southern Insurance Company to the bank, and its president and secretary had a right to borrow

the money for this purpose and use the notes and mortgages of the Citizens as collateral to this loan, but they had no authority to use these collaterals for the payment of the private debts of Will G. Harris, Russell E. Sharp, and L. T. Little to the bank. The complainant is entitled to recover as against the defendant Bank, these collaterals, or the proceeds thereof, over and above a sufficient amount to liquidate the note of $30,000.00 and that part of the $116,099.72 representing the indebtedness of the Southern to the Bank. It not sufficiently appearing how much has been realized from these collaterals and paid on the note of $116,099.72 and how much has been realized and paid from other collaterals held by the bank that were attached to this note, nor how much has been paid on the $30,000.00 note, a reference will be necessary to ascertain these facts. When the indebtedness of approximately $75,000.00 plus the indebtedness of $30,000.00 is discharged to the bank, then the complainant will be entitled to receive all over and above these amounts that have been collected on this collateral, or the collateral in the hands of the bank.

"The bank will pay the costs of this cause.

"Decree accordingly.

"Newman, Chancellor."

Ten assignments of error on behalf of the appellant receiver and two assignments of error on behalf of appellant Bank have been filed in this court. In the consideration of these assignments of error we will not follow the order of their assignment, but will dispose of them in the order which seems to us most convenient.

The second assignment of the Bank is that the chancellor erred in holding that Julian, receiver, etc., was authorized to bring this suit. If this assignment is well made, it is obvious that there will be no occasion to consider other assignments of error. But the orders of the federal court at Birmingham, by which Julian was appointed receiver, and the orders of the federal court at Nashville, by which he was appointed ancillary receiver, not only vested him generally with authority to bring such suits as might be necessary and proper in the administration of his receivership, but gave him specific authority to bring this particular suit. We have found no support in the record for the Bank's second assignment of error, and it is, therefore, overruled.

Taking up next the tenth assignment of the receiver (which will be presently stated), it will be remembered that it was alleged in complainant's bill (paragraph 14), as originally filed, that the taking and detention of the collateral involved herein, and the collection and detention of the proceeds collected therefrom, was, under the circumstances alleged in the bill, "in law a fraud on complainant and those whom complainant represents as Receiver." It was not until complainant amended his bill, after all the proof was taken, that he, by

162

his pleadings, made any allegations of actual fraud, or fraud in fact, against the defendant or any of its officers or agents. By the amendment of May 31, 1935, complainant added to the fourteenth paragraph of his bill the words, ''as well as a fraud in fact;'' and also added thereto the following:

"Complainant avers that the transactions herein alleged were all part of a fraudulent scheme, whereby the defendant American National Bank sought to secure payment of notes of questionable origin, which were worthless or of doubtful value, and these transactions were the culmination of a series of fraudulent transactions in which the defendant American National Bank and its officials had participated; and complainant further avers that in the furtherance of this fraudulent scheme, the defendant American National Bank and its officials colluded with the makers of the notes and with Joe F. Little, the President of the Citizens Life Insurance Company.''

██ It is seen that the foregoing amendment to the bill is quite general in its allegations, and is altogether lacking in specifications of the facts and circumstances which constituted the alleged ''fraudulent scheme'' and ''fraudulent transactions,'' and disregards the rule of equity pleading that ''the Court will pay no attention to general charges of fraud, misrepresentation, concealment, deceit and imposition when unaccompanied by the details and particulars thereof.'' Gibson's Suits in Chy. (2 Ed.), section 934, and authorities there cited. But much of the evidence in the record was elicited by the complainant in an effort to prove that the transactions (in 1929) here in question, were the culmination of a series of fraudulent transactions (in and prior to 1925) in which the defendant Bank and its officials had participated, and counsel for the receiver devote a considerable part of their brief to the proposition that the proof supports these charges of fraud. The defendant objected to much of the evidence to which we have just referred, on the ground that it was not relevant to the issues in the case, but it was admitted by the chancellor and there are no assignments of error here complaining of erroneous admission of evidence; hence we are considering all the evidence admitted below.

However, the chancellor found that the alleged fraudulent transactions of 1925 were not transactions of or with defendant Bank, and that they had no connection with the transactions of which the receiver complains in his bill in this case, which latter transactions, the chancellor finds, ''originated after the previous dealings complained of in the record between the Bank and the Southern had been closed.''

The chancellor's findings with respect to the alleged fraudulent transactions above mentioned are the subject matters of the receiver's tenth assignment of error, which is as follows:

"The Chancellor erred in holding: (1) 'The $75,000.00 indebtedness to the Bank evidenced by notes signed by the Southern, and paid with part of the proceeds of $116,099.72 note, originated after the previous dealings complained of in the record between the Bank and the Southern had been settled and closed. The loans made by the Bank involved in this $75,000.00 indebtedness, were all made from and after the spring of 1928, and have no connection with any of the other transactions complained of, and the Southern received and used the proceeds of all these notes.

" 'In January, 1925, it is claimed that Will G. Harris, a former President of the Southern Insurance Company, received a check from the Southern for $200,000.00 and misapplied the proceeds, and that certain officials of the Bank were the beneficiaries of part of the proceeds of this check; and that these officials of the Bank borrowed money from the Southern Insurance Company and made a loan to the Southeastern Trust Company, and that these transactions were fraudulent and a diversion of the funds of the Southern Insurance Company. It appears from the record that the Bank did not receive any benefit from any of these transactions, and that the officials of the Bank were acting in their individual capacities, and were engaged in an independent act on their own account with which the Bank had no connection whatsoever and which had no connection with the matters involved in this suit.'

"(2) 'That the various transactions alleged to have taken place between the officers of the Southern and certain officials of the defendant Bank, were acts of these officers as individuals, and not as officers of the Bank; that the Bank had no interest in these transactions, received no profit therefrom and the transactions are not connected with the matter involved, and the knowledge of these officers is not imputable to the Bank since it would have been against their interest to have disclosed it to the Bank.' "

It was the contention of the receiver, as repeatedly stated by his counsel in the course of taking proof, that the notes of the Southern Insurance Company, totaling approximately $75,000, described in complainant's bill, were not original notes at the time they purported to be, but that they were the residue of a series of notes or note executed by the Southern Insurance Company to the defendant Bank at some time in the early part of the year 1925 for $250,000. However, as before stated, the chancellor found otherwise, and this finding, among others, is challenged by the receiver's tenth assignment of error, supra.

We could not, within any reasonable limits of a written opinion, state the evidence in this voluminous record touching the disputed facts. As we understand the statute (Code 1932, section 10620) requiring this court to file a written finding of facts in chancery cases,

it contemplates that we shall state therein our findings of the ultimate determinative facts of the case, and it is not required that we shall burden the record with a review of all the evidence upon which our conclusions of fact are based.

In the case now before us, the chancellor's findings of fact challenged by the receiver's tenth assignment of error (and copied literally therein) are clearly stated, and, upon a consideration of all the evidence relating thereto, we find that they are supported by the record, and we concur therein.

We also agree with the chancellor in his ruling that, upon the facts found in the last paragraph of that part of his opinion quoted in the receiver's tenth assignment, such knowledge as may have been acquired by Messrs. Houston and Davis by reason of their individual transactions of 1925, is not imputable to the Bank. Freeman v. Citizens' National Bank, 167 Tenn., 399, 404, 70 S. W. (2d), 25, and other cases there cited. The receiver's tenth assignment of error is overruled.

At this point it may be well to mention the state of the record with respect to the allegation in complainant's bill that the collaterals which complainant seeks to recover in this case constituted a trust fund for the benefit of the plaintiffs in the suits in federal court under which complainant Julian was appointed receiver. This was denied by the defendant Bank in its answer to the bill. The chancellor held (for reasons stated in his opinion hereinbefore quoted) that the policyholders whom the receiver represents are "not now in a position to claim that this was a trust fund for their benefit;" that when "the Citizens took these securities over, they became part of the general assets of the Citizens Life Insurance Company unaffected by any trust" for the benefit of such policyholders.

In his original brief, the receiver cited the Acts of 1895, chapter 160, section 13 (now Code, section 6112), the Acts of 1895, chapter 160, section 24 (now Code, section 6128), and certain textbooks and adjudged cases, for support of the proposition that such statutory requirements created trusts for the protection of policyholders, and, upon that predicate, asserted that "unquestionably, the $101,099.54 of securities in this case were a trust fund ear-marked for the protection of those policyholders of the Southern Insurance Company, whose policies were reinsured by the Citizens Life Insurance Company under the reinsurance agreement of July 25, 1929."

But later, after the Bank's reply brief had been filed, a brief in reply to the Bank's brief was filed on behalf of the receiver, and in the latter brief it is said, inter alia, that

"We don't contend that the $101,099.54 of securities continued to be impressed with a trust after they were received by the Citizens Life Insurance Company. We concede, as contended by the defend-

ant, that these securities, when they came into the hands of the Citizens Life Insurance Company, became 'free' assets available for the payment in good faith of any valid obligations of the Citizens Life Insurance Company. . . .

"It is only on the question as to whether the Citizens Life Insurance Company became liable by operation of law for the notes of the Southern Insurance Company to the defendant American National Bank, that the trust fund doctrine is either relevant or important. This is its true significance.

"Clearly, as shown by the fourth proposition of our brief (see our Main Brief, pp. 183-186), the $101,099.54 of securities, which had been deposited with the Insurance Commissioner of the State of Tennessee, were a trust fund for the protection of the policyholders of the Southern Insurance Company and so remained a trust fund so long as they remained the property of the Southern Insurance Company. They remained the property of the Southern Insurance Company and impressed with the trust for the protection of its policyholders until the time (August 23, 1929) when they passed to the Citizens Life Insurance Company under the contract of reinsurance of July 25, 1929. Only thereafter were they, in any sense, 'free' securities not impressed with a trust.''

We think the concession thus made on behalf of the receiver is justified by the facts of this case and the applicable law; and, upon the hypothesis that when the securities sued for in this case had come into the possession of the Citizens Life Insurance Company they were ''free assets'' available for the payment or security in good faith of any valid obligations of the Citizens, we will proceed to the consideration of other assignments of error.

The questions presented by the receiver's fourth, fifth, sixth, seventh, and ninth assignments of error are, in large measure, cognate and interdependent, and may be, in part at least, considered together.

The fourth assignment is that, ''The Chancellor erred in decreeing that Joe F. Little, President, and R. E. Smith, Secretary, of the Citizens Life Insurance Company, had 'authority to borrow and pledge as collaterals, the assets of the Citizens Life Insurance Company on that part of the note for $116,099.72 which represented and was used in the liquidation of the indebtedness of the Southern Insurance Company to the Bank, evidenced by the four notes of that Company held by the Bank which the Citizens, in law, were obligated to pay and discharge, and that the defendant Bank has a right to hold the collateral deposited by these officials as collateral on this part of note and on the $30,000.00 note owing to it by the Citizens Life Insurance Company.' ''

The fifth assignment is a literal copy of the fourth assignment, supra, except that it omits the concluding words thereof, viz.: ''and

on the $30,000.00 note owing to it by the Citizens Life Insurance Company."

The sixth assignment is that, "The Chancellor erred in holding and decreeing that the Citizens Life Insurance Company 'in law were obligated to pay and discharge . . . the indebtedness of the Southern Insurance Company to the Bank, evidenced by the four notes of that Company held by the Bank.'"

The seventh assignment is that, "The Chancellor erred in holding and decreeing 'that the defendant Bank has a right to hold the collateral deposited by these officials (Joe F. Little and R. E. Smith) as collateral . . . on the $30,000.00 note owing to it by the Citizens Life Insurance Company' and to subject such collateral to the payment of that note."

The ninth assignment is that, "The Chancellor erred in holding that 'the action of the stockholders (of the Citizens Life Insurance Company) in giving its President and Secretary the power to pledge, assign and otherwise dispose of its real estate mortgages, gave them authority to pledge the collateral' (the $101,099.54 of securities) with the defendant American National Bank."

It is seen that the receiver is contending (through his sixth assignment) that the Citizens Life Insurance Company was not legally obligated to pay the indebtedness of the Southern Insurance Company to the Bank, evidenced by the four notes of the Southern held by the Bank; and is contending (through his fourth, fifth, and ninth assignments) that the president and secretary of the Citizens Life Insurance Company were without authority to borrow money from the Bank to pay debts of the Southern and to pledge as security for money thus borrowed the collaterals for which complainant is suing in this case.

The disposition of the seventh assignment, supra, manifestly depends upon the disposition of other assignments above stated; for, if the officers of the Citizens had lawful authority to pledge the collaterals as security for the payment of the $30,000.00 note, it follows, as a legal sequence, that the Bank has the right to hold the collaterals and subject them to the payment of that note; otherwise contra.

The chancellor held, in his written opinion, that "since the Southern conveyed all of its assets to the Citizens and became a mere shell and quit business, the Citizens thereby in law became obligated for the valid debts of the Southern;" and in this view we concur; but with the limitation that the indebtedness of the Southern, with which the Citizens was onerated, extended no further than the value of the property obtained by the Citizens from the Southern. Jennings & Co. v. Ice Co., 128 Tenn., 231, 237, 159 S. W., 1088, 47 L. R. A. (N. S.), 1058.

However, the limitation just stated was observed, at least tacitly,

by the chancellor in his decree, wherein he adjudged that the Citizens was obligated to pay and discharge "the indebtedness of the Southern Insurance Company to the Bank evidenced by the four notes of that Company held by the Bank." The aggregate of the "four notes" thus mentioned was much less than the value of the assets of the Southern received by the Citizens.

■ Upon the acquisition of the securities in question by the Citizens, the Bank became, by operation of law, a creditor of the Citizens to the extent of the aforesaid four notes of the Southern, and the substitution of the note of the Citizens for the notes of the Southern, and the pledge of the collaterals to secure such indebtedness of the Citizens, were within the lawful power of the Citizens.

We are further of the opinion that Joe F. Little, president, and R. E. Smith, secretary, had authority to "pledge as collaterals, the assets of the Citizens Life Insurance Company on that part of the note for $116,099.72 which represented and was used in the liquidation of the indebtedness of the Southern Insurance Company to the Bank evidenced by the four notes of that Company held by the Bank, which the Citizens, in law, was obligated to pay and discharge," as decreed by the chancellor.

■ The two officers of the Citizens above named not only had such authority by virtue of the resolution of the stockholders of the Citizens theretofore adopted on January 15, 1929 (as copied into the chancellor's findings, ante), but their acts in the premises were ratified by repeated renewals of the note and repledging of the collaterals by their successors in office, with the knowledge and acquiescence of the directors. "Ratification may be shown by such circumstances as raise a reasonable inference that the contract to be ratified is within the knowledge of those who choose to inquire, and who have full opportunity and means of inquiring." Stainback v. Junk Brothers Co., 98 Tenn., 306, 310, 311, 39 S. W., 530, 531.

The Southern had no connection with the $30,000.00 note mentioned in the receiver's seventh assignment, supra (which had been reduced by payments to $21,500 before the receiver was appointed). This note was given for money borrowed from defendant Bank and, as found by the chancellor, the Citizens received the benefit of the proceeds of this note and made repeated payments thereon. In the brief for the receiver it is insisted that the collaterals in question cannot be held by the Bank as security to this smaller note because the finance committee of the Citizens did not authorize such pledge of these securities until May 19, 1930, which was four days after the receivership bill had been filed in the federal court. If the right of the Bank to hold the collaterals in question for the "small note" depended alone upon the aforesaid action of the finance committee of the Citizens on May 19, 1930, there would be merit in the receiver's contention

just stated. Mechanics' Bank & Trust Co. v. Knoxville, S. & E. Railway Co., 148 Tenn., 113, 123, 251 S. W., 906, and other cases there cited.

But these securities were delivered to and pledged with defendant Bank on August 23, 1929, as collateral security to the Citizens' note for $116,099.72, and it was also stipulated in said note that, "This pledge is made to secure all sums of money for which the undersigned may now or hereafter be liable to the said Bank, either directly or contingently, and as principal, surety, guarantor, assignor, endorser or otherwise." The pledge thus made was authorized by the resolution of the stockholders of the Citizens adopted on January 15, 1929, as shown in the chancellor's findings; and we do not think the record supports the argument of the receiver (offered in support of his ninth assignment of error) that this transaction was not made in good faith by the Bank, but was fraudulent.

Whether the Citizens was or not insolvent at the time the securities in question were pledged to defendant Bank is not a controlling consideration in the case. "A corporation is not insolvent in such sense that its assets become a fixed trust fund in the hands of its officers for pro rata distribution among its creditors so long as it continues to be a going concern, conducting its business in the ordinary way, although its debts may greatly exceed its assets." Hicks v. Whiting, 149 Tenn., 411, 355, 258 S. W., 784, 797. And so long as a corporation "is in the active exercise of its functions" it "may exercise as full dominion and control over its property as an individual;" and a creditor of such corporation, while it "is a going concern, although actually insolvent, is entitled to pursue the ordinary legal and equitable remedies for the enforcement of his claims." McClaren v. Roller Mill Co., 95 Tenn., 696, 698, 35 S. W., 88. See, also, McKeldin v. Gouldy, 91 Tenn., 677, 681, 20 S. W., 231; Gibson's Suits in Chancery (2d Ed.), sec. 806, subsec. 2.

The receiver's fourth, fifth, sixth, seventh, and ninth assignments of error are overruled.

The receiver's eighth assignment is that, "The Chancellor erred in failing to decree that the element of illegality or fraud in the payment of the notes of Russell E. Sharp, Lloyd T. Little and Will G. Harris tainted the entire transaction with illegality and fraud, including the payment of the four notes of the Southern Insurance Company which the Chancellor held were by operation of law liabilities of the Citizens Life Insurance Co."

For support of his eighth assignment the receiver relies upon cases holding that, if a part of the consideration for a note be legal, but is so connected with an illegal consideration that it cannot be separated from it, it taints the whole transaction. Potts v. Gray, 3 Cold. 468, 91 Am. Dec. 294; Mechanics' Savings Bank & Trust Co. v. Duncan (Tenn. Ch. App.), 36 S. W., 887, 890.

But in Potts v. Gray, supra, 3 Cold. 468, at page 470, 91 Am. Dec., 294, the court quoted with approval the rule stated in 2 Kent's Commentaries, 468, as follows, "Where any matter, void even by Statute, be mixed up with good matter, which is entirely independent of it, the good part shall stand, and the rest shall be held void; though, if the part which is good depends upon that which is bad, the whole instrument is void; and the rule is, if any part of the consideration be malum in se, or the good and void consideration be so mixed, or the contract so entire that there can be no apportionment, the whole is void."

In the same opinion the court quoted from a New York case (Barton v. Port Jackson Co., 17 Barb. 397) the statement that, "Where a contract grows out of, or is connected with, an illegal act, the Court will not lend its *active aid* to enforce it." (The italic is ours.)

In each of the Tennessee cases just cited, the holder or holders of notes were seeking the "active aid" of the court to obtain judgments against the makers of such notes.

In the instant case, the receiver, not the Bank, has sought the "active aid" of the court, and the chancellor has decreed that the Citizens Life Insurance Company was not bound by the act of its president and secretary in paying the individual notes of Will G. Harris, Russell E. Sharp, and Lloyd T. Little to the defendant Bank and pledging the assets of the Citizens Life Insurance Company for money borrowed in its name for that purpose. The chancellor's ruling just stated is challenged by the Bank's first assignment of error (which is yet to be considered), but, assuming for the purposes of the consideration of the receiver's eighth assignment, supra, that the chancellor did not err in granting to complainant the relief above indicated, it does not follow that the chancellor should have decreed that the Citizens was not bound for any part of the note for $116,-099.72, and that the complainant is entitled to the securities pledged for its payment.

One of the settled maxims of equity jurisprudence is that, "He who seeks equity must do equity." Gibson's Suits in Chancery (2d Ed.), secs. 31 and 39.

With reference to the application of this maxim, in Pomeroy's Equity Jurisprudence (4th Ed.), vol. 1, sec. 388, it is said:

"It may be regarded as a universal rule governing the court of equity in the administration of its remedies, that whatever may be the nature of the relief sought by the plaintiff, the equitable rights of the defendant, growing out of or intimately connected with the subject of the controversy in question, will be protected; and for this purpose the plaintiff will be required, as a condition to his obtaining the relief which he asks, to acknowledge, admit, provide for, secure, or allow whatever equitable rights (if any) the defendant may have,

and to that end the court will, by its affirmative decree, award to the defendant whatever reliefs may be necessary in order to protect and enforce those rights. This principle is not confined to any particular kind of equitable rights and remedies, but pervades the entire equity jurisprudence, so far as it is concerned with the administration of equitable remedies.''

See, also, same volume, section 385; 10 R. C. L., p. 392; 21 C. J., p. 172.

The principle embodied in this maxim has been applied in numerous reported cases in this state, among which are the following: McMinn v. Richmonds, 6 Yerg. 9, 20; Cooley v. Weeks, 10 Yerg. 141, 145; Smith v. Evans, 5 Humph. 70, 77; Elliott v. Cochran, 2 Sneed, 468, 471; Coppedge v. Threadgill, 3 Sneed, 577, 584, 585; Wood v. Chilcoat, 1 Cold., 423, 430; Arrington v Grissom, 1 Cold., 522, 525; Creed v. Scruggs, 1 Heisk., 590-592; Sporrer v. Eifler, 1 Heisk. 633, 636, 637; Martin v. Turner, 2 Heisk, 384, 389; Aiken v. Suttle, 4 Lea, 103, 120; Campbell v. Bryant, 2 Shan. Cas. 146, 150; Bloomstein v. Brien, 3 Tenn. Ch. 55, 68; Sartain v. Dixie Coal & Iron Co., 150 Tenn., 633, 643-645, 266 S. W., 313.

A pleading by the defendant relying upon or invoking the maxim that ''he who seeks equity must do equity'' is not essential. Such relief is in the nature of a condition imposed upon the complainant, and not granted in response to an affirmative pleading by the defendant. Sartain v. Dixie Coal & Iron Co., supra, 150 Tenn., 633, pp. 644, 645, 266 S. W., 313; Anderson v. Binford, 2 Baxt. 310, 317.

The receiver's eighth assignment of error is overruled.

The receiver's first, second, and third assignments are, in substance and effect, merely an assertion that the chancellor erred in failing to grant the relief prayed for in complainant's bill. These three assignments, standing alone, are too general and indefinite to merit consideration as assignments of error. National Life & Accident Insurance Co. v. American Trust Co., 17 Tenn. App., 516, 527, 68 S. W. (2d), 971. If the decree of the chancellor was not erroneous for any of the reasons specified in the other assignments of the receiver, it necessarily follows that the chancellor did not err in failing to grant the relief sought by the complainant. The receiver's first, second, and third assignments of error are overruled. This disposes of all of the receiver's assignments of error.

The first assignment of the appellant Bank is that, ''The Chancellor erred in decreeing that Citizens Life Insurance Company had not purchased the stock of Little, Harris and Sharp for the sum of $41,000, and was not obligated for the payment thereof, and was without authority to pay this amount for the use and benefit of said individuals to defendant American National Bank to release the stock

held by said Bank so that it might be transferred to Citizens Life Insurance Company and voted by it in respect to the transactions between that company and Southern Insurance Company."

As found by the chancellor, all that the Citizens received for the payment of the notes of Harris, Little, and Sharp, held by the Bank, was 7,300 shares of Southern Insurance Company stock which was of no value whatever because the Southern had no assets or business, and it was beyond the corporate powers of the Citizens to use its funds or property, without consideration, for the payment of the private debts of Harris, Sharp, and Little. We are unable to understand how the stock of the Southern thus acquired by the Citizens could be voted by the Citizens "in respect to the transactions between that Company and the Southern," as suggested in the Bank's assignment of error, supra, for the contract by which the Southern had transferred all its business and assets to the Citizens had been fully consummated before said Southern Insurance Company stock of Harris, Little, and Sharp was acquired by the Citizens. The Bank's first assignment of error is overruled.

It results that all of the assignments of error are overruled and the decree of the chancery court will be affirmed and the cause will be remanded to the chancery court of Davidson county, part 2, for the execution of the reference ordered by the chancellor, and for all such orders and decrees as may be necessary or proper and not inconsistent with the opinion and decree of this court.

The costs of the appeal will be divided, one-half of same to be paid by each of the appellants and their respective sureties.

Crownover and DeWitt, JJ., concur.